Sadé A. Turner, #11181
STRONG & HANNI, P.C.
102 South 200 East, Suite 800
Salt Lake City, Utah 84111
Telephone: (801) 532-7080
Facsimile:  (801) 596-1508
Email: sturner@strongandhanni.com

Lisa S. Kantor, Pro Hac Vice
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, California 91324
Telephone: (818) 886-2525
Facsimile:  (818) 350-6272
Email: lkantor@kantorlaw.net

Attorneys for Plaintiff, Rachel S.

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| RACHEL S., | ) | Case No. 2:14-cv-778-DB |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S OPPOSITION TO THE** |
| v. | ) | **PLAN'S COMBINED MOTION FOR** |
| | ) | **SUMMARY JUDGMENT AND** |
| LIFE AND HEALTH BENEFITS | ) | **OPENING SUPPORTING** |
| PLAN OF THE AMERICAN RED | ) | **MEMORANDUM** |
| CROSS, | ) | |
| Defendant. | ) | |
| | ) | Judge Clark Waddoups |
| | ) | |

# TABLE OF CONTENTS

I.   INTRODUCTION ..........................................................................................................1

II.   ARGUMENT ................................................................................................................2

   A.   The Standard of Review is *De Novo* .....................................................................2

   B.   The IRO Decision Should Be Reversed.................................................................5

      1.   The IRO Report Contains Misstatements of Fact .........................................5

      2.   The IRO Doctor Had Incomplete Medical Records.......................................8

      3.   The Reviewer's Conclusion Is Not Supported By The Cited Medical Literature ............9

   C.   The Plan's Decisions Were Contrary to the Facts ...............................................12

      1.   Initial Denial Effective September 18, 2012 Was Not Supported By The Medical Evidence ....................................................................................12

      2.   The Level One Appeal Denial Was Similarly Defective ..............................15

      3.   The Second Level Appeal Decision Was Not Medically Sound ...................16

   D.   The Plan's Decision Was An Abuse of Discretion Because It Was Not Supported By Substantial Evidence ....................................................................20

III.   CONCLUSION...........................................................................................................24

# TABLE OF AUTHORITIES

## Federal Cases

*Abatie v. Alta Health & Life Ins. Co.*,
  458 F.3d 955 (9th Cir.2006).............................................................................4

*Adamson v. Unum Life Ins. Co. Of Am.*,
  455 F.3d 1209 (10th Cir. 2006)....................................................................20, 21

*Aetna Health Inc. v. Davila*,
  542 U.S. 200, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004) ......................................3

*Black & Decker Disability Plan v. Nord*,
  538 U.S. 822, 123 S. Ct. 1965, 155 L.Ed.2d 1034 (2003) ...............................21, 22

*Caldwell v. Life Ins. Co. of N. Am.*,
  287 F.3d 1276 (10th Cir.2002).....................................................................20, 21

*Carlo B. v. Blue Cross Blue Shield of Massachusetts*,
  2010 WL 1257755 (D. Utah 2010) ...............................................................22

*CIGNA Corp. v. Amara*,
  563 U.S. 421, 131 S. Ct. 1866, 179 L. Ed. 2d 843 (2011) .....................................2

*Drum v. Hartford Life and Acc. Ins. Co.*,
  942 F. Supp.2d 1171 (D. Utah 2103) ............................................................21

*Duncan v. Metropolitan Life Ins. Co.*,
  2015 WL 6651317 (D. Utah 2016) ................................................................3

*Graham v. Hartford Life & Acc. Ins. Co.*,
  5489 F. 3d 1345 (10th Cir. 2009).................................................................20, 21

*Hall v. UNUM Life Ins. Co. of Am.*,
  300 F.3d 1197 (10th Cir.2002)...................................................................17, 18

*K.F. ex rel. Fry v. Regence Blue Shield*,
  2008 WL 4223613 (W.D.Wash. 2008) .............................................................3, 4

*Kimber v. Thiokol Corp.*,
  196 F. 3d 1092 (10th Cir. 1999)...................................................................20

*LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment &
  Dependent Life Ins. Plan*,
  605 F.3d 789 (10th Cir. 2010)......................................................................3

*Lamantia v. Voluntary Plan Adm'r, Inc.*,
  401 F.3d 1114 (9th Cir.2005).......................................................................4

*McGraw v. Prudential Ins. Co..*,
   137 F. 3d 1253 (10th Cir. 1998)........................................................................................4, 5
*Messick v. McKesson Corp.*,
   640 F. App'x 796 (10th Cir. 2016) ...................................................................................3
*Nance v. Sun Life Assurance Co.*,
   294 F.3d 1263 (10th Cir. 2002).........................................................................................4, 5
*Okuno v. Reliance Standard Life Ins. Co.*,
   836 F. 3d 600 (6th Cir. 2016)...........................................................................................22
*Pac. Shores Hosp. v. United Behavioral Health*,
   764 F.3d 1030 (9th Cir. 2014).........................................................................................14, 15
*Quesinberry v. Life Ins. Co. of N. Am.*,
   987 F.2d 1017 (4th Cir.1993)...........................................................................................17, 18
*Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*,
   585 F.3d 1311 (10th Cir. 2009)........................................................................................17
*Rush Prudential [HMO, Inc. v. Moran]*,
   536 U.S.[355, 122 S.Ct. 2151] n. 16 ...............................................................................3
*Salomaa v. Honda Long Term Disability Plan*,
   642 F. 3d 666 (9th Cir. 2011)...........................................................................................22
*Sandoval v. Aetna Life & Cas. In. Co.*,
   967 F.2d 377 (10th Cir. 1992).........................................................................................20
*Shaw v. AT&T Umbrella Benefit Plan No. 1*,
   795 F. 3d 538 (6th Cir. 2015).........................................................................................22
*Williams v. Metropolitan Life Ins. Co.*,
   459 Fed. Appx. 719 (10th Cir. 2012) ...............................................................................20, 21, 22

State Statutes

UT ST § 31A-22-629(1)(b)(iv).................................................................................................3
UT ST § 31A-22-629(6)(a)(iii)..................................................................................................5

Federal Regulations

42 C.F.R. § 438.910 (d) (2) (vi)..............................................................................................13

## I.    INTRODUCTION

In her Opening Brief, plaintiff Rachel S. demonstrated that defendant Life and Health Benefits Plan of the American Red Cross (the "Plan"), through is claims administrator Cigna Behavioral Health ("Cigna"), wrongfully denied authorization for her residential treatment at Avalon Hills Treatment Center from October 5, 2012 through December 31, 2012.[1]

In its Combined Motion for Summary Judgment and Opening Supporting Memorandum ("Plan Brief"), the Plan argues that (1) the decision of the independent review organization (IRO) was final and binding; (2) this Court should review that decision under an abuse of discretion standard; and (3) neither the IRO nor the Plan/Cigna abused their discretion because they gathered records, communicated with Avalon Hills, and consulted with doctors. The Plan's arguments fail as a matter of law and fact.

The decision of the IRO must be reviewed by this Court under a *de novo* standard of review. The Plan did not exercise discretion after that decision was made; by its own assertion, the IRO decision was "final and binding." The Plan language did not and could not delegate discretion to the IRO.

Moreover, under an abuse of discretion standard of review, a decision cannot be upheld unless it is supported by substantial evidence. This requires a substantive review of the decision compared with the evidence upon which it is based.  Merely following a proper process is not enough. And the process here was far from satisfactory. The IRO doctor did not review all the

---

[1] Rachel is not pursuing benefits for her partial hospitalization treatment from January 1, 2013 through January 17, 2013.

medical records. There is no evidence in the Administrative Record as to the qualifications of any of the reviewers. And the Administrative Record is missing notes of the second level appeal.

Finally, the decision to deny authorization was contrary to the overwhelming weight of the evidence contained in the Administrative Record, including that Rachel was consistently suicidal and had attempted suicide shortly before and during treatment; had ongoing medical problems including orthostasis and abnormal blood values; continued to struggle to eat her meals, control her urges to exercise, and within extreme body image distortion; and purged for the first time in December 2012, breaking a blood vessel in her eye.

For these reasons, and for the reasons stated in the Opening Brief, Rachel requests that this Court enter judgment in her favor.

## II.  ARGUMENT

### A.  The Standard of Review is *De Novo*

In her Opening Brief, Rachel argued that the standard of review is *de novo* because Cigna applied its own internal guidelines rather than plan language in determining that Rachel's residential treatment was not medically necessary. Opening Brief, pp. 22-24.

In its Opening Brief, the Plan admits that the internal guidelines were prepared by Cigna for use in evaluating claims for mental health treatment and serve as a "decision support tool." Plan Opening Brief, pp. 6-7. But the Plan offers no argument that Cigna was allowed to ignore clear Plan language and instead rely solely on guidelines, created by Cigna and which are not plan documents, to make the medical necessity determination. *Id.* For this reason alone, the standard of review must be *de novo*. See *CIGNA Corp. v. Amara*, 563 U.S. 421, 436, 131 S. Ct. 1866, 1877,

179 L. Ed. 2d 843 (2011); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 213, 124 S. Ct. 2488, 2498,

159 L. Ed. 2d 312 (2004); *Messick v. McKesson Corp.*, 640 F. App'x 796, 798 (10th Cir. 2016);

*LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins.*

*Plan*, 605 F.3d 789, 796-97 (10th Cir. 2010); *Duncan v. Metropolitan Life Ins. Co.,* 2015 WL

6651317 (D. Utah 2016).

There is an additional reason why the standard of review is *de novo*. Throughout its Brief,

the Plan asserts that "[t]he Independent Review Organization, not Cigna, made the *final binding*

determination regarding the medical necessity of Rachel S.'s residential treatment at Avalon Hills

after October 4, 2012." Plan Brief, p. 2 (emphasis added). See also pp. 7, 27, 31.[2] If the "final

binding" decision was made by the IRO, not the Plan, then the standard of review must be *de*

*novo.*

In *K.F. ex rel. Fry v. Regence Blue Shield*, 2008 WL 4223613 (W.D.Wash. 2008)*,* as here,

the claimant utilized a statutory external review procedure. The defendant, as here, was compelled

to accept the decision of the IRO. The court correctly concluded that the standard of review

therefore was *de novo.*

As discussed in *Rush Prudential [HMO, Inc. v. Moran]*, 536 U.S.[355, 122 S.Ct.

2151] at 2169 n. 16 and 2170 [(2002)], states are permitted to remove the

---

[2]The independent review process was created pursuant to statute, and is a voluntary process by which a claimant can have an independent review organization render "an independent and impartial decision on an adverse benefit determination." UT ST § 31A-22-629(1)(b)(iv). Curiously, the IRO process was not described in the applicable Plan (Compare Rachel S. Rec. 2335 with Rachel S. Rec. 2370-71) but was described in the applicable SPD (see Rachel S. Rec. 2402-3). The SPD describes the decision of the IRO as "final and binding."

administrator's discretionary authority to determine an insured's eligibility for benefits by incorporating binding external review procedures into the terms of the plan. Washington has done so through RCW 48.43.535 . . . In such circumstances, Regence's adoption and implementation of the IRO's decision was mechanical and did not involve the exercise of discretion. The *de novo* standard of review therefore applies. *Lamantia v. Voluntary Plan Adm'r, Inc.*, 401 F.3d 1114, 1122 (9th Cir.2005). The Court will evaluate the entire administrative record, including the decision of the IRO, to determine whether the final denial of benefits was correct or incorrect. See *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006) (where de novo review applies, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits ...").

*K.F. ex rel. Fry v. Regence Blueshield*, 2008 WL 4223613, at *2 (footnote omitted).

The same result should be reached here. Since the Plan simply implemented the binding decision of the IRO, this Court should review the IRO decision *de novo*.

In an attempt to avoid the *de novo* standard of review, the Plan argues that it has conveyed discretion to the IRO, based on the following language:

The IRO will review all of the information and documents timely received and other relevant information it determines to review. The IRO will make a decision that is independent of any decisions that has preceded it…" (Rachel S. Rec. 2403)

The Plan relies in this regard on *Nance v. Sun Life Assurance Co.,* 294 F.3d 1263, 1268 (10th Cir. 2002) and *McGraw v. Prudential Ins. Co.*. 137 F. 3d 1253, 1259 (10th Cir. 1998). In

4

*Nance*, the Tenth Circuit found that the language "proof satisfactory to Sun Life" conferred discretion on Sun Life. In *McGraw,* the Tenth Circuit found that the language "determined by Prudential" conferred discretion on Prudential.

No similar language appears in the SPD here. To the contrary, the SPD merely states that the IRO will review information and make an independent decision. Indeed, the statute requires that the IRO remain independent and not be a "health plan's fiduciary." UT ST § 31A-22-629(6)(a)(iii). Any grant of discretion to the IRO would therefore violate the statute.

For these reasons, this Court should review the decision of the IRO *de novo*.

**B.      The IRO Decision Should Be Reversed**

The IRO decision cannot withstand analysis for several reasons. First, the report contains significant misstatements of fact. Second, the reviewer had incomplete medical records. Third, the medical sources cited by the reviewer do not support the conclusion reached.

*1.      The IRO Report Contains Misstatements of Fact*

The IRO review makes numerous misstatements of fact in his/her report. The report states that, on October 5, 2012, Rachel "reported increasing energy and improving mood," had "no suicidal ideation," was compliant with her medications and nutritional program. The reviewer also writes that progress notes *after* October 5, 2012, "do not show any significant or severe psychological or medical symptoms." (Rachel S. Rec. 0517). The reviewer also states that Rachel had "longstanding" purging and that her diagnosis was Anorexia Nervosa with Binge-Purge Features. *Id.* These statements are simply wrong.

5

Rachel's individual therapy session on September 28, 2012 focused on her relationship with her siblings and how the characteristics they share are not helpful toward healthy communication or distress tolerance. She talked about how her family members do not share emotions or ask for help from each other, as this is a sign of weakness. She also shared their positive qualities, i.e., they all work hard. (Rachel S. Rec. 1055) In a body image session on the same day, Rachel stated that she was having a hard time with self-image and weight gain. She said she was "feeling ok with herself at that moment" but "couldn't fathom gaining more weight." (Rachel S. Rec. 1056) The therapist challenged her to sit openly without covering herself up, and reported that she continued to struggle with an intense fear of gaining weight. *Id.*

On October 4, 2012, Rachel reported that her anxiety was a 7 out of 10. (Rachel S. Rec. 1052) She was "delighted" that she was able to express herself in a recent family session with her mother and was encouraged to be more open and vulnerable with peers. *Id.* On October 8, 2012, Rachel discussed her noncompliance with and resistance to treatment. She was having great difficulty expressing her emotions toward people and situations that frustrate her. The therapist helped her work through these emotions, and the session ended with Rachel processing the experience of being found on the floor after attempting suicide before her admission to Avalon Hills. Rachel was tearful as she talked through this experience. (Rachel S. Rec. 1052)

On October 12, 2012, Rachel talked about her *lack* of energy and *lack* of motivation. She reported suicidal thoughts, stated that "her mind will create a plan of how she can kill herself, but she is unwilling to do this." (Rachel S. Rec. 1049) On October 16, 2012, the nurse practitioner and psychiatrist confirmed that Rachel had suicidal ideation and visible anxiety. Her mood was

6

dysphoric and her affect was blunted and restricted. Her insight and personal judgment remained impaired. Her dosage of Zoloft was increased. (Rachel S. Rec. 1766) On October 23, 2012, Rachel reported again to the psychiatrist that she had frequent thoughts around suicide and "ways she could accomplish this." (Rachel S. Rec. 1764)

On November 20, 2012, Rachel tried to kill herself by strangling herself with a seatbelt while on a pass with her family. (Rachel S. Rec. 1760-61) Rachel was orthostatic from admission through November 16, 2012. (Rachel S. Rec. 1900-1929) On December 4, 2012, Rachel again became significantly orthostatic, and was placed on exercise restriction and ordered to drink 64 ounces of Gatorade per day. (Rachel S. Rec. 1762, 1895)

On December 20, 2012, Rachel purged for the first time during a home pass. She had multiple episodes of binging and purging during this home pass, breaking a blood vessel in her eye. (Rachel S. Rec. 1582, 1707) On December 31, 2012, she had gained 10 pounds (as a result of bringing), endorsed suicidal ideation, and had abnormal lab results indicating anemia, infection and liver damage. (Rachel S. Rec. 1078, 1760)

These facts, taken from the medical records, belie the IRO reviewers' conclusions. Clearly Rachel had "significant or severe psychological or medical symptoms" after October 5, 2012. After October 5, 2012, Rachel tried to commit suicide, was significantly orthostatic, binged and purged for the first time, broke a blood vessel in her eye, and had abnormal lab results indicating significant medical concerns. Moreover, Rachel did not report "increasing energy or improving mood" as of October 5, 2012. To the contrary, she was lacking energy, reported high anxiety, consistently endorsed suicidal ideation, was struggling with treatment compliance and was

7

resistant to weight gain. Finally, Rachel did not have a longstanding history of purging; she purged for the first time in December 2012.

The reviewer's failure to accurately state the facts of Rachel's treatment undermines the credibility of his/her conclusion. The reviewer concluded, based on erroneous facts, that residential treatment was not medically necessary for Rachel after October 5, 2012. Since the facts were incorrect, the conclusion cannot stand.

2.    *The IRO Doctor Had Incomplete Medical Records*

The IRO reviewer wrote that he reviewed 212 pages of medical records. (Rachel S. Rec. 0516). The reviewer does not identify those records or indicate the dates of service the records represent. A close analysis of the Administrative Record reveals that the reviewer did *not* review all of the medical records relating to Rachel's treatment and provided to Cigna.

On April 4, 2013, Avalon Hills sent two sets of documents to Cigna. Cigna affixed the number 12292300360482 to each page of the first set of documents. These first set included 86 pages of medical records for dates of service September 7, 2012 through October 15, 2012.[3] (Rachel S. Rec. 1143-1239)

The second set of documents sent by Avalon Hills were numbered by Cigna from 1309872474-703. This set included 213 pages of medical records for dates of service October 4, 2012 through January 16, 2013.[4] (Rachel S. Rec. 1311-1540)

---

[3] The rest of this set of documents included an appeal letter, a letter of support from Rachel's mother, and various copies of the certified mail receipt and records request.
[4] The rest of this set of documents included two appeal letters, and copies of the IRO requests.

Avalon Hills sent additional documents on June 20, 2013. These were numbered by Cigna from 131767105-67. These documents included 48 pages of medical records for dates of service December 31, 2012 through discharge. (Rachel S. Rec. 1240-1302)

The IRO doctor was asked to perform his review on June 26, 2013. (Rachel S. Rec. 05126). As of that time, Cigna had 347[5] pages of medical records for Rachel's treatment from September 7, 2012 through January 17, 2013. It is unclear which 212 pages were given to the IRO reviewer. This Court should not trust the credibility of a medical report which lacks the foundation of a full and complete review of the available medical records.

3.      *The Reviewer's Conclusion Is Not Supported By The Cited Medical Literature*

In support of his/her decision, the IRO reviewer cites three medical resources. The first is a textbook which the reviewer cites to support the statement that the "patient's treatment is in accordance with this definitive textbook." (Rachel S. Rec. 0518). Since the reviewer did not use this textbook to support the decision to authorize a lower level of care, this citation is irrelevant.

The second citation is to a 2009 journal article which the reviewer claims "supports care at the Day Hospital level for this patient beginning 10/5/12." The article does nothing of the sort. The article is described by the authors as follows:

Day hospital (DH) treatments for eating disorders (EDs) provide intensive daily care and allow patients to maintain and test their social relations and coping skills at

---

[5] In her Opening Brief, Rachel stated that her records consisted of 633 pages. Opening Brief, p. 28. While this is correct, a complete set was submitted in April 2014 in connection with her appeal of the denial of partial hospitalization treatment.

home and outside. Although widespread, *their description is lacking. This review compares the different types of DH described in the literature and presents our DH experience in Turin, Italy*. We searched Psychinfo and Pubmed with the following keywords: anorexia nervosa, bulimia nervosa, EDs, DH, day treatment and partial hospitalisation. We found and reviewed the DH programmes of eleven specialised centres, which have some shared features but also many differences, suggesting that DH treatments are still largely experimental. Briefly, the shared elements are: biopsychosocial model as reference frame; cognitive-behavioural model or techniques; behavioural contract; patients' selection; body image therapy; involvement of family; weight normalisation/weight gain and modification/normalisation of eating behaviour as objectives. Nonetheless, shared opinions concerning inclusion criteria are lacking; the duration of DH treatment is surprisingly different among centres (from 3 to 39 weeks); the approach to eating and compensation behaviours ranges from control to autonomy; followup and psychometric assessment can be either performed or not; psychological and behavioural objectives can be different. *This review suggests the existence of two different DH models: the first has a shorter duration and is mainly symptom-focused; the second is more individual-focused, has a longer duration and is focused on patients' relational skills, psychodynamic understanding of symptoms and more*

10

*gradual changes in body weight. Further investigation is required to make DH*

*treatment programmes measurable and comparable.*[6]

The final reference is to a book by Drs. Mehler and Andersen entitled "Eating Disorders: A Guide to Medical Care and Complications." The reviewer states that Rachel "did not manifest any of the severe medical symptoms described in this text which would require the continued [dates of service] at the [residential] level of care." (Rachel S. Rec. 0518). The only discussion of level of care in this book includes the following:

It is important to remember that eating disorders are disorders of behavior as well as disorders of psychopathology and medical disorders. An inpatient level of care[7] may be required because the severity of the behavioral pathology, not, as third-party payers at times demand, only because of abnormal laboratories or suicidality. *Patients can die with normal laboratory values.* The sum total of the complexity of the case, its chronicity, its lack of response to lower levels of treatment, its comorbidity, the intransigence of the behavioral abnormalities, all factor into decision making leading to inpatient care.[8]

---

[6] *Day hospital programmes for eating disorders: a review of the similarities, differences and goals.* Abbate-Daga G, Gramaglia C, Preda S, Comba E, Brustolin A, Fassino S. Eat Weight Disord. 2009 June-Sep; 14(2-3) (emphasis added). https://www.ncbi.nlm.nih.gov/pubmed/19934635

[7] The book describes "inpatient" as hospitalization, not residential.

[8] *Eating Disorders: A Guide to Medical Care and Complications.* Mehler, PS, MD and Andersen, AE, MD (2010) (emphasis in original). Plaintiff's counsel will have this book available for the Court at the time of trial.

Nothing in this discussion supports the reviewer's conclusion that Rachel did not require continued residential treatment.

In sum, the decision of the IRO reviewer lacks credibility and is contrary to the evidence. Application of the *de novo* standard of review to this decision compels entry of judgment in favor of Plaintiff.

**C.     The Plan's Decisions Were Contrary to the Facts**

In making a *de novo* determination of Rachel's claim, this Court may decide to consider the decisions of the Plan which preceded the IRO decision. For the reasons stated below, the decisions of the Plan were not supported by the medical evidence.

*1.     Initial Denial Effective September 18, 2012 Was Not Supported By The Medical Evidence*

On September 17, 2012, Avalon Hills reported to Cigna that Rachel was expressing passive suicidal ideation and self-harm thoughts, rated 5 of 10. The thoughts came into her head during the day and increased as the day progressed. Rachel was irritable and anxious, was constantly body checking, and would examine herself in the mirror for long periods of time. She was struggling with the meal plan and felt she was getting "extremely fat." The staff observed Rachel under-plating her food, turning a waffle with butter upside down to get the butter off, and choosing lower calorie foods. Avalon Hills specifically told Cigna that the treatment team, which consisted of a psychiatrist, physician's assistant, therapist, dietician, and nurse, did not believe Rachel was ready for a lower level of care at this time. She was not close to her weight range but was eating a high number of calories. She was struggling with her meal plan, using liquid supplements, and eating very slowly. Rachel's thinking was still very distorted. In addition, her

labs were still abnormal and she suffered from medical problems including orthostasis. (Rachel S. Rec. 0458)

Cigna's case manager noted that Rachel had "current medical problems" and orthostasis but nevertheless refused to authorize additional days of treatment. Instead, she consulted with Dr. Shah. Dr. Shah's position and qualifications are not contained in the record. (Rachel S. Rec. 0460).

The case notes indicate that Dr. Shah requested and reviewed nursing and group notes from September 13, 2012 through September 17, 2012, although there is no evidence that copies of those notes were received at this time. The case manager wrote that there was no evidence during this four-day period of suicidal ideation or self harm and "family involvement has been happening." *Id.* The case notes inconsistently state both that Rachel's weight was stable and that she was consistently gaining weight. Finally, the case manager wrote that one outpatient provider had been previously listed for 6 sessions but that "no other [treatment] forms had been attempted." *Id.* For these reasons, the matter was sent for a peer review. (Rachel S. Rec. 0459)

The referral for a peer review was completely improper. First, the fact that Rachel did not "fail first" at a lower level of care is a legally improper basis to deny a claim for mental health treatment. Under the Federal Mental Health Parity Act, a claim cannot be denied on this basis unless the insurer can demonstrate that it denies medical/surgical claims on the same basis. 42 C.F.R. § 438.910 (d) (2) (vi). Second, the inconsistent notes about Rachel's weight certainly do not support referral to a peer review. Nor does Dr. Shah's conclusion that, for four days, Rachel did not have suicidal or self- harm thoughts, especially since there is no evidence in the record as

13

to what Dr. Shah reviewed. Furthermore, Avalon Hills specifically reported to Cigna that Rachel

had passive suicidal ideation and self-harm thoughts during the prior week. (Rachel S. Rec.

0458). Neither the case manager nor Dr. Shah expressed any valid basis for disbelieving Avalon

Hill's statement.

Moreover, the case manager completely ignored Rachel's medical complications, inability

to comply with her meal plan, over-exercising and distorted thinking. (Rachel S. Rec. 0458)

The matter was then referred for a peer review with Dr. Barbara Center. The Plan

describes Dr. Center as "a Cigna Medical Director." Plan Brief, p. 10. She was not a Cigna

Medical Director. Dr. Center worked for Prest & Associates. (See Rachel S. Rec. 0460) Dr.

Center inexplicably found that Rachel was "fully compliant with her 4440 kcal per day meal

plan" but conceded that she continues to eat slowly and tries to exercise at times. (Rachel S. Rec.

0463) Dr. Center also recognized that Rachel still has "some suicidal ideation, but no specific

intent or plan. She stated that her religious beliefs would keep her from killing herself." *Id.* Under

"Findings," Dr. Center incorrectly wrote that Rachel was medically stable, repeated that she was

fully compliant with her meal plan, repeated that Rachel had continued suicidal ideation but

"states that she would not kill herself because of her religious beliefs," and concluded that Rachel

did not meet the Cigna guidelines for residential level of care, without specifying the specific

criteria. (Rachel S. Rec. 0464).

Dr. Center's sloppiness in conducting peer reviews was the subject of decision by the

Ninth Circuit in *Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1038 (9th Cir.

2014). There, the Court found that Dr. Center made a number of obvious mistakes and

14

demonstrated a "striking lack of care" in her review. *Id.* at 1044. The same is true here. As noted

above, Rachel was not compliant with her meal plan. And there is not a single reference in the

record that Rachel's religious beliefs would keep her from killing herself. Indeed, she attempted

suicide before her admission to Avalon Hills and Dr. Center was aware of this attempt. (Rachel S.

Rec. 0462). She also attempted suicide again in November 2012. (Rachel S. Rec. 1760) As in

*Pac. Shores Hosp.,* Dr. Center has demonstrated a striking lack of care in her review of Rachel's

claim.

Cigna sent a denial letter to Rachel dated September 18, 2012 which purported to reflect

Dr. Center's determination. But the letter simply stated: "the treatment plan implemented has led

to sufficient improvement so that you can safely move to and sustain improvement in less

restrictive levels of care." (Rachel S. Rec. 0529) Of course, as explained above, Rachel had not

sustained "sufficient improvement" as she was still suicidal, medically compromised, unable to

comply with her meal plan, and suffering from distorted thinking. In addition, Cigna did not tell

Rachel the factually defective bases for Dr. Center's conclusions.

For these reasons, the initial denial of treatment was improper.

2. *The Level One Appeal Denial Was Similarly Defective*

The Level One Appeal was conducted by Dr. Mohsin Qayyum. Again, no information is

provided in the record as to Dr. Qayyum's qualifications. The case notes contain little analysis by

Dr. Qayyum. The level one appeal denial letter from Cigna contained similar misstatements as the

original denial letter. For example, the letter stated that Rachel was "not suffering from acute and

severe mental health or medical conditions" and that she did "not have significant impairment in

[her] blood pressure, pulse or laboratory results." (Rachel S. Rec. 0526) To the contrary, Cigna knew that Rachel was orthostatic, and had abnormal BUN/CR, AST, ALT and blood sugar levels. Cigna specifically wrote that "YES" next to "CURRENT MEDICAL PROBLEMS." (Rachel S. Rec. 0458). Cigna also wrote that Rachel was not reporting any thoughts of harm to herself, despite the fact that Avalon Hills specifically reported that Rachel was expressing passive suicidal ideation and self-harm thoughts at a rating of 5 of 10. *Id.* Cigna stated that "safe and effective treatment was available at a lower level of care," but failed to explain why it disagreed with Avalon Hills' opinion that it would not be safe for Rachel to be treated at a lower level of care. (Rachel S. Rec. 0458, 0526).

The decision on the First Level Appeal was simply wrong.

### 3.   *The Second Level Appeal Decision Was Not Medically Sound*

The second level appeal was decided by a committee consisting of one doctor and two other people. The administrative record does not reveal the qualification of any of the members of the committee.

However, the Administrative Record contains no substantive notes of this important call. The only notes in the record indicate that a call took place and a decision was reached. (See Rachel S. Rec. 0473-4).

In contrast, Avalon Hills meticulously recorded everything that was said by all parties to the call. Avalon Hills shared vital information with Cigna, including that Rachel had been persistently suicidal (7-9 out of 10), had attempted suicide shortly before the call, and lacked the ability to control repetitive and intrusive thoughts regarding her eating disorder behaviors,

experiencing those thoughts 4-6 hours per day. Avalon Hills also reported that Rachel was having difficulty controlling her urges to exercise, and was caught exercising in the shower around October 5, 2012. See Declaration of Tera Lenesgrav-Benson, Ph.D., Exh. A.

Cigna interjected that Avalon Hills only had 3 minutes left, at which point Rachel's mother spoke up, upset that Cigna was only allowing 10 minutes to present the appeal. She pleaded with Cigna to "cover her daughter to help her get well and save her life." *Id.*

This document is important for several reasons. First, as noted above, there are no notes of this call in the Administrative Record. Second, the information in the Avalon Hills notes are not reflected in the IRO report. The reviewer indicated that he was given the Cigna case notes but those notes do not reflect his information. (See Rachel S. Rec. 0473-4) As discussed above, the reviewer reached the erroneous conclusion that Rachel did not have any significant psychological or medical problems at or after October 5, 2012. The Avalon Hills notes confirm that Rachel suffered from severe psychological and medical problems, and that Cigna was made aware of these problems.

The Tenth Circuit has sided with the majority of courts in holding that "the best way to implement ERISA's purposes in this context is ordinarily to restrict *de novo* review to the administrative record, but to allow the district court to supplement that record 'when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision.'" *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1318 (10th Cir. 2009), citing *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir.2002) (quoting *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1025 (4th

17

Cir.1993) (en banc)). To provide guidance to the courts, the *Hall* Court agreed with the Fourth

Circuit that the following exceptional circumstances could warrant the admission of additional

evidence:

> claims that require consideration of complex medical questions or issues regarding
>
> the credibility of medical experts; *the availability of very limited administrative*
>
> *review procedures with little or no evidentiary record*; the necessity of evidence
>
> regarding interpretation of the terms of the plan rather than specific historical facts;
>
> instances where the payor and the administrator are the same entity and the court is
>
> concerned about impartiality; claims which would have been insurance contract
>
> claims prior to ERISA; and circumstances in which there is additional evidence that
>
> the claimant could not have presented in the administrative process.

*Hall* at 1203, citing *Quesinberry* at 1027 (emphasis added).

Here, Plaintiff has requested that this Court consider notes taken in the regular course of

business by Avalon Hills of the Second Level Appeal call, as they are the *only* evidentiary record

of that critical call.

The decision following the Second Level Appeal call was contrary to the medical

evidence. The denial letter stated that coverage was extended through October 4, 2012 "as you

needed additional time for further stabilization and to work on discharge planning" and that as of

October 5, 2012, Rachel was "cooperative more motivated to treatment, gaining insight, attending

and participating in groups, caring for self and willing to get help." (Rachel S. Rec. 0521) Despite

these statement, there was nothing magical that happened on October 5, 2012 to support this

decision. In fact, Rachel remained orthostatic on October 5, 2012 and through the middle of November. (Rachel S. Rec. 1900-1910) She continued to have eating disorder thoughts and urges, was anxious and depressed, had urges to self-mutilate, lacked energy and lacked motivation for recovery, and had "visible anxiety related to actual weight gain and a distorted body image." (Rachel S. Rec. 1049, 1053, 1057, 1678, 1765, 1795, 1801, 1803) Cigna simply cannot justify the choice to extend coverage only through October 4, 2012.

Although Cigna admitted that Rachel was having "some" ongoing suicidal thinking, the denial letter asserts that she was "not having recurrent (sic) intent or plan to harm self." (Rachel S. Rec. 0521). To the contrary, on October 12, 2012, Rachel had increased suicidal thoughts and disclosed to her therapist that her "mind will create a plan" for how she could kill herself. (Rachel S. Rec. 1049) On October 16, 2012, Rachel's psychiatric progress note indicated that Rachel had "suicidal thoughts." (Rachel S. Rec. 1765) On October 23, 2013, Rachel had "intrusive thoughts around suicide" and "frequent thoughts of ways she could accomplish" suicide. (Rachel S. Rec. 1764) And on November 20, 2012, Rachel tried to kill herself. (Rachel S. Rec. 1760) It is impossible to imagine how Cigna could conclude on December 11, 2012 that Rachel had no intent or plan to harm herself.

For these reasons, the Plan's second level appeal decision, like its prior decisions, cannot withstand scrutiny.

19

### D.   The Plan's Decision Was An Abuse of Discretion Because It Was Not Supported By Substantial Evidence

Should the Court decide to apply the abuse of discretion standard of review, judgment should still be entered in favor of Plaintiff. This is because the Plan's decision was not supported by substantial evidence.

A plan decision is an abuse of discretion if it is not supported by substantial evidence. *Caldwell v. Life Ins. Co. of N. Am.,* 287 F.3d 1276, 1282 (10th Cir.2002). "Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion." *Id; Graham v. Hartford Life & Acc. Ins. Co.,* 5489 F. 3d 1345, 1358 (10th Cir. 2009). Substantial evidence means more than a scintilla, of course, yet less than a preponderance. *Sandoval v. Aetna Life & Cas. In. Co.,* 967 F.2d 377, 382 (10th Cir. 1992).

The substantiality of the evidence is evaluated against the backdrop of the administrative record as a whole. *Adamson v. Unum Life Ins. Co. Of Am.,* 455 F.3d 1209, 1212 (10th Cir. 2006) (citing *Caldwell,* 287 F.3d at 1282). To determine whether the evidence to support the administrator's decision is substantial, a court must consider whether any information in the record undercuts the administrator's conclusion. *Caldwell* at 1282; *Williams v. Metropolitan Life Ins. Co.,* 459 Fed. Appx. 719, 723 (10th Cir. 2012). "We give less deference if a plan administrator fails to gather or examine relevant evidence." *Caldwell* at 1282 (citing *Kimber v. Thiokol Corp.* 196 F. 3d 1092, 1097 (10th Cir. 1999).

The Plan argues that it did not abuse its discretion in terminating authorization for Rachel's treatment of October 4, 2012. The Plan contends that substantial evidence supported every level of Cigna's determination because it "objectively and thoroughly administered"

20

Rachel's claims, communicated regularly with Avalon Hills to obtain updated medical information, consulted different doctors on different levels of appeal who reviewed medical evidence, and relied on the opinions of those doctors. Plan Brief pp. 24-27. Nowhere in its brief does the Plan discuss or analyze the contents of the medical evidence or attempt to demonstrate that opinions of the doctors upon which it relied was supported by those contents.

The Plan's approach fatally confuses process with substance. A plan abuses it discretion when it commits the *procedural* error of failing to examine a material proportion of relevant evidence. *Williams* at 729; *Drum v. Hartford Life and Acc. Ins. Co.,* 942 F. Supp.2d 1171, 1182-3 (D. Utah 2103). And a plan also abuses it discretion when the substance of its decision is not supported by substantial evidence. *Graham* at 1358; *Adamson* at 1212; *Caldwell* at 1282. That is what happened here.

The Plan argues that it was not required to defer to the opinion of the treating physician. While this is true, it is also true that a plan administrator "may not arbitrarily refuse to credit a claimant's credible evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L.Ed.2d 1034 (2003). Here, at every level of review, the Plan simply ignored what Avalon Hills reported about Rachel's status and treatment. No attempt was made, in any of the telephone calls or the letters, to explain why or how Cigna or the Plan disagreed with Avalon Hills' assessment. No explanation was given for ignoring critical facts, such as Rachel's medical instability, suicidality, inability to complete her meals, severe body disturbance, and urges (and attempts) to over exercise, or how she was to deal with these significant issues in a lower level of care. As one Court has explained, "An

21

administrator does not do its duty under the statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.'" *Salomaa v. Honda Long Term Disability Plan,* 642 F. 3d 666, 680 (9th Cir. 2011). See also *Shaw v. AT&T Umbrella Benefit Plan No. 1,* 795 F. 3d 538, 548-550 (6th Cir. 2015).

The Plan asserts that this Court will not resolve a dispute between a treating physician and a peer review physician. Rachel is not asking this Court to do so. Rather, the question before this Court is whether there is substantial medical evidence in the Administrative Record to support the Plan's decisions. In making this determination, as the Court recognized in *Carlo B. v. Blue Cross Blue Shield of Massachusetts,* 2010 WL 1257755 at * 4 (D. Utah 2010), "Those who examine only paper – even courts – find themselves at a distinct disadvantage when it comes to evaluating the genuine needs of a living, breathing human being in distress." See also *Okuno v. Reliance Standard Life Ins. Co.,* 836 F. 3d 600, 610 (6th Cir. 2016)(failure of the insurance company to conduct a physical examination raises questions about the thoroughness and accuracy of the benefits determination).[9]

The Plan further argues that this Court must uphold its decision if it is reasonable, even if it disagrees with it. While this may be true, the Plan makes no attempt to demonstrate that the decision is reasonable.

---

[9] The Plan cites *Willams*, supra, for the unremarkable proposition that a treating physician "may feel sympathy for her patient." *Williams* at 726. The *Williams* Court also recognized "the bias of reviewing physicians." *Id.* at 726, citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L.Ed.2d 1034 (2003). In Plaintiff's view, these general statements offer little guidance to this Court in resolving the particular case at issue.

In her Opening Brief, Rachel demonstrated that the decisions of the Plan and the IRO were not supported by substantial medical evidence and therefore were unreasonable. See Opening Brief, pp. 27-30. She also demonstrated that, under any standard of review, she was entitled to benefits from October 4, 2012 through December 31, 2012. See Opening Brief, pp.24-27. Those arguments will not be repeated here.

In summary, however, the decisions of the Plan and the IRO were unreasonable for the following reasons:

1.   The IRO did not review all of the medical evidence.

2.   The IRO reviewer misstated that Rachel had a longstanding history of purging and that her diagnosis was Anorexia Nervosa with Binge-Purge features. Rachel purged for the first time in December 2012 and her diagnosis was Anorexia Nervosa. (Rachel S. Rec. 0517, 1589, 1638, 1640, 1707)

3.   The IRO reviewer relied on irrelevant and contradictory medical resources.

4.   The IRO reviewer ignored Rachel's suicidal ideation and suicide attempt.

5.   The reason Rachel's case was sent for an initial peer review violated the Federal Mental health parity Act.

6.   The choice of October 4, 2012 as the last covered day was not explained by Cigna or the IRO reviewer. Rachel was orthostatic before and after October 4, 2012. She was suicidal before and after October 4, 2012.

7.   Cigna repeatedly and consistently ignored Rachel's suicidal ideation.

23

8.      Cigna put undue emphasis on Rachel's weight to the exclusion of her other symptoms.

9.      Dr. Center stated that Rachel was medically stable when she was not; she was orthostatic and had abnormal lab results.

10.     Dr. Center stated that Rachel would not attempt suicide because of religious reasons when there is nothing in the medical record to support this statement and Rachel had already attempted suicide prior to her admission to Avalon Hills.

11.     At each denial, Cigna failed to explain the basis for its disagreement with the information it received from Avalon Hills regarding Rachel's medical status and proper level of care.

12.     None of the Cigna reviewer's qualifications are in the Administrative Record.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in her favor for benefits in the amount of $107,200 for 67 days of residential treatment at Avalon Hills between October 5, 2012 and December 31, 2012 and allow her to file a motion for attorney fees and costs.

Dated: February 22, 2017

STRONG & HANNI
KANTOR & KANTOR, LLP

*Lisa S Kantor*

Lisa S. Kantor
*Attorneys for Plaintiff Rachel S.*

24

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 22nd of February, 2017, I electronically filed the foregoing Plaintiff's Opposition to the Plan's Combined Motion for Summary Judgment and Opening Supporting Memorandum with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James L. Barnett
Holland & Hart
222 South Main Street, Suite 2200
Salt Lake City, Utah 84101
jbarnett@hollandhart.com

Jack M. Englert, Jr.
Holland & Hart
6380 South Fiddler's Green Circle, Suite 500
Greenwood Village, Colorado 80111
jenglert@hollandhart.com

Dated: February 22, 2017

STRONG & HANNI
KANTOR & KANTOR, LLP

Lisa S. Kantor
*Attorneys for Plaintiff Rachel S.*