IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RACHEL S.,<br><br>               Plaintiff,<br><br>v.<br><br>LIFE AND HEALTH BENEFITS PLAN OF<br>THE AMERICAN RED CROSS,<br><br>               Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No.   2:14-cv-778<br><br>Judge Clark Waddoups |

## **INTRODUCTION**

Rachel S. received residential treatment at Avalon Hills Eating Disorder Treatment Center from August 16, 2012 to December 31, 2012.   She was insured under Life and Health Benefits Plan of the American Red Cross (the "Plan") at the time she received treatment.   Cigna Behavioral Health administers "[c]laims for mental health benefits under the Plan."   Pl.'s Opening Brief, at 5 (ECF No. 30).[1]   Cigna denied payment for services Rachel received from October 5, 2012 to December 31, 2012, on the basis that she did not need residential treatment—partial hospitalization

---

[1]   This decision contains two types of record citations.   One is to the administrative record found at ECF No. 28, and the other is to briefs that have been filed.   When citing to the administrative record, the court refers to the "Rachel S. Rec." pagination at the bottom of the page.   Many pages also have a "Rachel S." numbering system at the bottom.   The court has disregarded that numbering system when citing to the administrative record.   When the court cites to a brief, the record citation refers to the ECF pincite at the top of the page.

or intensive outpatient treatment were adequate according to Cigna.   At the final appeal level, an external, independent review organization affirmed the denial.

Rachel now "seeks judgment in the amount $107,200, which represents benefits for 67 days of residential treatment."   *Id.* at 6.   Cigna moves for summary judgment to dismiss all claims.   It also moves to strike an additional record that Rachel seeks to introduce.   The court concludes a *de novo* standard of review applies and that expert testimony is needed to resolve some of the issues in this case.   Other claims, however, warrant dismissal.   Accordingly, the court grants in part and denies in part Cigna's Motion for Summary Judgment.   The court also denies Cigna's Motion to Strike.

## FACTUAL BACKGROUND

### Overview of Condition and September 2012 Coverage Determination

In July 2012, Rachel attempted to commit suicide a second time after struggling with an eating disorder for approximately one year.   Admin. R., at 440, 1754 (reporting first suicide attempt in January 2012).   Upon advice of her medical provider, Rachel entered residential treatment at Avalon.   *Id.* at 941.   At the time of her admission on August 16, 2012, Rachel was at 82 percent of her ideal body weight ("IBW").   *Id.* at 441–42.   Rachel also "was over exercising and severely restricting her food intake, and was experiencing cardiac complications of her eating disorder."   Pl.'s Opening Brief, at 5 (ECF No. 30); Admin. R., at 1065, 1104.   Avalon diagnosed Rachel with anorexia nervosa, major depressive disorder, generalized anxiety disorder, and history of separation anxiety disorder.   Admin. R., at 1179.   Rachel denied suicidal ideation at the time of admission.   *Id.* at 441.

Rachel started taking Zoloft on August 24, 2012.   Admin. R., at 452.   Although Rachel

initially had high motivation to change, *id.* at 1065, on August 27, 2012, Rachel's motivation had decreased, and she struggled with eating increased calories and certain foods.   *Id.* at 446–47.   She was able to "participate very well in group," and got "along very well with the others" in her groups.   *Id.* at 447.   Nevertheless, her insight was "pretty limited," and her weight had decreased to 77 percent of her IBW.   *Id.* at 447, 453 (stating she had dropped additional weight after admission).   Rachel also continued making attempts to over-exercise.   *Id.* at 447.

On September 5, 2012, the case notes reported that Rachel had to be put on a special diet due to her refusal to eat.   Admin. R., at 449.   When she did eat, she ate very slowly and left "a lot of food" on her plate.   *Id.*   Because of poor body image, Rachel wore a poncho or covered herself in a blanket.   *Id.*   On September 12, 2012, the case notes reported that Rachel pleaded to be allowed to go home and threatened to leave against medical orders.   *Id.* at 455.

On September 17, 2012, Rachel expressed passive suicidal ideation on a scale of 5 out of 10 and had to contract for safety.[2]   Admin. R., at 457.   Her suicidal thoughts increased during the day as she was required to eat.   *Id.* at 458.   She thought her meal plan had too many calories, and she expressed that she was "getting extremely fat."   *Id.* at 458, 463 (quotations omitted).   She engaged in attempts to underplate and lower calories through surreptitious means.   *Id.* at 458.   Because of her religion, the case notes stated religious topics were to be introduced into her recovery.   *Id.*   The case notes specifically addressed whether Rachel was ready to step down to partial hospitalization and concluded she needed too much supervision for a step-down to be

---

2 "The contract for safety is a procedure used in the management of suicidal patients," and is an agreement whereby a patient agrees not to commit suicide.   *Bradley v. Berryhill*, No. 1:17-cv-1322, 2019 U.S. Dist. LEXIS 82257, at *6 n.4 (E.D. Cal. May 14, 2019) (citations omitted).

successful.  *See id.* at 463 (noting among other things that the meal plan "would be hard to maintain" and she "would go back to overexercising").  Rachel still lacked understanding about appropriate exercise and was at 85 percent of her ideal body weight.  *Id.* at 462–63.

Nevertheless, on that same date, a Cigna reviewer concluded Rachel no longer qualified for residential care after September 17, 2012.  Admin. R., at 460.  The reviewer noted that the nursing notes from September 13, 2012 to September 17, 2012 did not document any suicidal ideation and that Rachel had gained some weight.  Admin. R., at 460, 463.  Cigna's review notes also acknowledged, however, that other records reported that Rachel did have suicidal ideation, just no specific intent or plan.  *Id.* at 463.  Per the Cigna reviewer, Rachel had reported "she would not kill herself because of her religious beliefs."  *Id.* at 463–64.  It is unknown from what source that information derived because it does not appear to be in Avalon's record.  Although Rachel was engaging in surreptitious means to avoid calories, Cigna found that Rachel was "fully compliant with her meal plan."  *Id.* at 463.  Thus, it concluded Rachel no longer met level of care requirements and could "safely move to and sustain improvement in less restrictive levels of care." *Id.* at 464.

Rachel filed an expedited appeal of Cigna's decision.  On September 21, 2012, Cigna issued a formal denial.  Cigna stated it had denied benefits based on the terms of the Plan. Admin. R., at 526.  Other than informing Rachel she should refer to her "plan documents for requirements regarding medical necessity determinations," the denial letter does not state how Rachel failed to meet Plan requirements for medical necessity.  *Id.* at 526–27.  Instead, it stated the following:

> The clinical basis for this decision is: Based upon the available information, your symptoms do not meet the *medical necessity criteria* of *Cigna Level of Care Guidelines* for Residential Treatment for Eating Disorders for continued stay from 09/18/2012 as you are not suffering from *acute*[3] and severe mental health or medical symptoms to require *intensive* monitoring in a residential setting.  Your eating disorder symptoms have improved.  Your current body *weight is not significantly lower* than you [sic] expected body weight.  You do not have significant impairment in your blood pressure, pulse or laboratory results.  You are not reporting *any* thoughts to harm yourself or others.  Your *behavior is stable* and you are not suffering from significant limitations in your usual, daily functioning.  Safe and effective treatment can be provided in a *less restrictive setting*.  Timely and appropriate treatment is available at a lower level of case.

*Id.* at 526 (emphasis added).   The reasons Cigna relied on for denying coverage are contrary to the record evidence.   Rachel appealed the formal denial.

**American Psychiatric Association Guidelines**

The Plan contemplates that Cigna may develop "internal rules" for a claim determination.  *See* Admin. R., at 2401.   Cigna chose to do so.   Cigna's Level of Care Guidelines for Behavioral Health & Substance Abuse ("Cigna's Guidelines") state that Cigna "adopted nationally developed and published guidelines of the American Psychiatric Association ["APA"] . . . due to their acceptance as the best of evidence-based practice for mental health and substance use disorders."[4]  *Id.* at 360.

---

[3]   The Plan specifies that services provided at a residential treatment center are for subacute treatment.   Admin. R., at 341.   To the extent Cigna denied coverage because Rachel did not meet acute standards, such a denial would be improper.   *Raymond M. v. Beacon Health Options, Inc.*, No. 2:18-cv-048, 2020 U.S. Dist. LEXIS 94615, at *53–55 (D. Utah May 29, 2020).

[4]    Although Cigna states it adopted the APA Guidelines, Cigna's Guidelines are not the same.  Thus, "adopted" does not appear to be used in the sense of making them its own.

According to the APA, "[a]norexia nervosa is a complex, serious, and often chronic condition that may require a variety of treatment modalities at different stages of illness and recovery."  Admin. R., at 1993.  The APA Guidelines state when determining if "a different level of care is appropriate, it is important to consider the patient's overall physical condition, psychology, behaviors, and social circumstances rather than simply rely on one or more physical parameters, such as weight."  *Id.* at 1966.  Before a patient may be discharged, the APA Guidelines state the patient "need[s] to both gain healthy body weight *and* learn to maintain that weight."  *Id.* at 1989 (emphasis added).  They also state "patients who reach a healthy body weight but are discharged before this learning occurs are likely to immediately decrease their caloric intake to excessively low levels."  *Id.*

The APA Guidelines caution that as a patient regains weight, the patient may "become unhappy and demoralized about resulting changes in body shape."  Admin. R., at 1968. Numbers on a scale may cause "a resurgence of anxious and depressive symptoms, irritability, and sometimes suicidal thoughts."  *Id.*  Thus, "*sustained* weight gain and weight maintenance" are important treatment considerations.  *See id.* (emphasis added).  The APA Guidelines also warn that "[p]atients with inadequate motivation or support who are discharged from inpatient to partial hospitalization programs before they are clinically ready often have high rates of early relapse, greater struggles with recovery, and slower rates of progress, necessitating longer future inpatient stays."[5]  *Id.* at 1989.  With the APA's accepted guidelines in mind, the court notes the following facts about Rachel's condition following Cigna's first denial.

---

[5]   In the end, besides impacting the patient's health, premature discharge gives rise to greater costs, not less.

**Plaintiff's Level of Progress Following First Denial**

On September 28, 2012, Rachel was told that her weight gain was "slightly on the slower side," so her meal plan was going to be increased.   Admin. R., at 1735.   In reply, Rachel reported that "her meal plan [was] giving her *more* stress as time [went] on."   *Id.* (emphasis added).   On October 2, 2012, Rachel's "[i]nsight and judgment remain[ed] impaired by symptoms."   *Id.* at 1767.   She appeared, however, to be more motivated about her recovery and "more willing to accept her body."   *Id.* at 1054.   Yet, on October 8, 2012, Rachel's counseling session focused on her "non-compliance and resistance to treatment, direct care staff, and weight restoration."   *Id.* at 1052.   She desired to resist staff who held her accountable.   *Id.*   On October 12, 2012, Rachel talked "about her lack of energy, lack of motivation, and surrendering herself to recovery."   *Id.* at 1049.   She felt depressed and had suicidal ideation, but was vague about her thoughts.   *Id.* Nevertheless, she reported that she would constantly see something, and it would cause her mind to "create a plan on how she [could] kill herself."   *Id.*   She also stated, however, that she would not harm herself.   *Id.*

On October 16, 2012, Rachel reported that her mood was "pretty good," but she continued to report suicidal ideation and had "visible anxiety related to actual weight gain and a distorted body image."   Admin. R., at 1766.   Rachel's psychiatrist noted that Rachel had to "be closely monitored."   *Id.*   On October 18, 2012, Rachel reported worries about her meal plan and that her body would get used to the high calorie plan.   *Id.* at 1020–21.   The following day, she expressed "significant distress" over her weight gain.   *Id.* at 1020.

On October 23, 2012, Rachel was "attentive and cooperative."   Admin. R., at 1765.   Yet, she continued to have "difficulty with intrusive thoughts around suicide and having frequent

thoughts of ways she could accomplish this."   *Id.* at 1764.   She appeared fatigued and had anxiety about her body image.   *Id.*   She denied a specific plan to harm herself, but the psychiatrist again noted that Rachel had to "be closely monitored."   *Id.* at 1765.

On the same day, a treatment note stated, "Rachel continues to have high anxiety centered on comparison with her siblings and anxiety of mom."   Admin. R., at 1377.   Rachel's family was involved in her treatment efforts, which allowed Rachel to work on issues with her family.   While such efforts were necessary, important, and commendable, on October 23, 2012, Rachel expressed how the dynamics made her irritable and overwhelmed.   *Id.* at 1366.   She had "anxiety related to managing everyone's reactions, emotions, and worry."   *Id.*   Thus, while she was gaining insights with her family, those efforts remained stressful beyond the time Cigna denied benefits.

By October 29, 2012, Rachel participated appropriately in scheduled physical activities, but she was observed making extra trips around the house as a form of exercise in non-compliance to her treatment.   Admin. R., at 1373.   The following day, Rachel processed her negative thoughts and feelings about the size of her clothing.   *Id.* at 1365.   Although "[s]he was able to recognize her increase in distress," she "struggled to manage it."   *Id.*   In other words, having the insight did not translate into her having the ability to manage her distress over the size of her clothing.

In November 2012, Rachel had reached her target weight and Avalon allowed her to go on a home pass.   Admin. R., at 1248.   Nevertheless, a clinician noted that Rachel "continue[d] to struggle with intense distress around her body image and having a desire to change her physical appearance to ease her discomfort."   *Id.* at 1362.   Following a family therapy session on November 20, 2012, Rachel was in a low mood and subsequently reported attempting to commit

suicide.   On November 26, 2012, Rachel reported the following during an individual therapy session.

> [S]he was sitting in the back of the car [after a therapeutic pass] and was alone and isolating and had the urge to hurt herself.  Rachel stated that she wrapped the seatbelt around her neck and attempted to strangle herself.  Rachel stated that she did it for as long as she could and then let it go.

*Id.* at 1790.   She explained that she did not ask for help because of her "feeling of weakness and that seh [sic] did not want everyone to know how she was feeling."[6]  *Id.* at 1791.   Afterwards, she felt guilty for the incident.   *Id.*   Rachel discussed with her therapist ways to stay safe.   *Id.* She then authorized her therapist "to talk to staff about how [the incident] happened and how to prevent it from happening in the future."   *Id.*

On November 27, 2012, Rachel also reported the incident while she was in group therapy. Admin. R., at 1014.   She said it left her feeling "vulnerable, sad, and frustrated."   *Id.*   On November 28, 2012, Rachel reported during group therapy that she felt "hurt, frustrated, ashamed, and angry . . . after opening up in process group . . . about her recent history of self-harm attempts." *Id.*

Cigna contends, however, "that this 'suicide attempt' was not as serious as Rachel S.'s opening brief would lead one to believe," and that Rachel has "mischaracterized the evidence about suicidal ideation in an attempt to buttress her claim."   Def.'s Opening Brief, at 15 (ECF No. 33). Although Rachel made the above reports, Cigna asserts Rachel made a contrary report to her

---

[6]   An individual therapy note three days earlier noted that "Rachel struggles to share her emotions openly with others," and that she "encounters her own personal rules for showing and expressing emotions when in the presence of family or peers."   Admin. R., at 1364.

psychiatrist on November 27, 2012.   Cigna quotes the following language from the psychiatrist

report:

> On Tuesday evening [November 20, 2012, Rachel] became
> depressed when returning home from the Sports Authority and self-
> reported that she wrapped a seatbelt around her neck in the back seat
> of the SUV and *thought about strangling herself*.   This event was
> self-reported and *not corroborated by staff or peers*.

*Id.* (quoting Admin. R., at 1763) (emphasis in Opening Brief).   Cigna contends the psychiatrist

report shows Rachel did not attempt to commit suicide, but merely thought about it.   Cigna further

contends Rachel denied suicidal ideation during the relevant period in other reports and that even

if the event did occur, "it was of short duration and did not result in any injury to her."   *Id.* at 16.

Cigna is correct that Rachel did report she was not suicidal before the event.   Cigna's

quote from the psychiatric report, however, fails to include relevant facts.   A more complete quote

is as follows:

> *According to Treatment Team*, the patient had a *rough time* at the
> beginning of law week. On Tuesday evening [November 20, 2012],
> she became depressed when returning home from the Sports
> Authority and self-reported that she wrapped a seatbelt around her
> neck in the back seat of the SUV and thought about strangling
> herself. This event was self-reported and not corroborated by staff
> or peers.  *The patient, however, did this in the past when upset en
> route from Jackson Hole*.

Admin. R., at 1763 (emphasis added).   Thus, it was not Rachel who reported that she *thought*

about killing herself; that fact seemingly was based on a Treatment Team statement.   Moreover,

the psychiatrist noted that Rachel's report was consistent with another past attempt by her.

Finally, the psychiatrist report stated Rachel's mood on the date of their visit was "depressed and

anxious," with her "[a]ffect restricted, appropriate and mood-congruent."   *Id.*   When all of the

10

reports are viewed together, they do not support the incident was minor.   It also bears noting that even if Cigna were correct that Rachel merely thought about suicide, she still wrapped a seat belt around her neck while contemplating suicide.   This is so notwithstanding her consistent statements to staff that she would not act on her suicidal ideation.

In early December, Rachel's vitals were unstable again.   She had to be restricted from exercise therapy and was placed on maximum fluids.   Admin. R., at 993, 1762.   When her vitals stabilized the following week and she was allowed to resume exercise, Rachel once again over-exercised.   *Id.* at 992.   Later that month, during another home pass attempt, Rachel started binging and purging multiple times.   *Id.* at 1582, 1707.   She broke a blood vessel in her eye due to purging.   *Id.* at 1759.

The above provides only some of the details in the record, but it highlights the complexity of Rachel's condition.   The evidentiary record is extensive.   It contains psychiatrist notes, individual therapy notes, group therapy notes, nursing notes, dietician reports, body-image reports, exercise reports, laboratory reports, and so forth.   The record shows that on some days Rachel did better than on other days.   This was so from the outset of her admission.   In other words, her recovery was not linear.   Nor could it be defined by her state on a particular day.   The relevant question, based on the industry standard, was not whether Rachel could step down for a few days and be okay.   It was whether there were sufficient indicators to support Rachel could step down and sustain an ability not to restrict, over-exercise, and otherwise continue in her progress when in a less restrictive setting.   Determining whether Rachel was ready to step down from residential treatment to partial hospitalization had to be based on the totality of the evidence.

**Cigna's Second Denial and Review by Independent Review Organization**

Except for Rachel's conduct during the latter part of December 2012, all the above was known to Cigna when it conducted the level two appeal on December 10, 2012.   The panel partly reversed the earlier denial that stopped coverage after September 17, 2012.   Admin. R., at 520. The panel concluded Rachel met coverage requirements through October 4, 2012 because she "needed some additional time for further stabilization and to work on discharge planning."   *Id.* at 520–21.   Consequently, it approved coverage for services rendered on September 18, 2012 through October 4, 2012.   *Id.*   As of October 5, 2012, the panel found the following:

> [Y]ou were no longer meeting the continued stay Level of Care Guidelines for Residential Treatment Eating Disorders.   As of 10/05/2012, you were cooperative more motivated to treatment, gaining insight, attending and participating in groups, caring for self and willing to get help.   Although you were still having body distortions and thoughts of restricting, you were continuing to gain insight and weight with an ideal body weight above 91% and you were medically stable.   Although you were still having some ongoing suicidal thinking you were not having recurrent intent or plan to harm self.   Your depression was improving in that you were getting out of bed, caring for self, attending and participating in groups and activities and not exhibiting impairments in your ability to understand your treatment.   You and your family were actively addressing family conflicts and your family was involved and supportive of your treatment.   As of 10/05/2012 there were no longer any medical or psychiatric symptoms that required continued 24-hour monitoring or would have prevented treatment at a less restrictive level of care such as in a partial hospital program.

*Id.* at 521.   Similar to its first denial, Cigna stated it had denied benefits based on the terms of the Plan.   *Id.* at 520.   Other than informing Rachel she should refer to her "plan documents for requirements regarding medical necessity determinations," the second denial letter also does not state how Rachel failed to meet Plan requirements for medical necessity.   *Id.* at 521.

Rachel subsequently pursued an external appeal through Independent Medical Expert Consulting Services, Inc. ("IMEDECS") as part of her appeal rights.   The IMEDECS reviewer was "board certified in psychiatry with expertise in eating disorders."   Admin. R., at 516.   On July 18, 2013, the reviewer affirmed Cigna's determination that Rachel no longer qualified for residential treatment as of October 5, 2012 because that treatment level was not medically necessary.   *Id.* at 515, 517.   Specifically, the reviewer stated the following:

> Progress notes document that by 10/5/12, the patient had reached a weight of 136.2, 91 percent of ideal weight, a BMI (body mass index) of 19, with a goal weight of 145 to 155, having increased 12.8 lbs.   She reported increasing energy and improving mood.   She still experienced eating disordered psychopathology which is typical of patients with Anorexia Nervosa.   Treatment at a lower level of intensity of care is necessary for months and often years for complete remission of the core psychopathology.   On 10/5/12, the patient had no suicidal ideation.   She was compliant with medications and her nutritional program. Progress notes after 10/5/12 do not show any significant or severe psychological or medical symptoms which would change this decision and require more [dates of service] at the RT level of care.

*Id.* at 517.

The reviewer listed the materials he or she reviewed to reach these conclusions.   Admin. R., at 516.   The list states the reviewer considered Cigna's Guidelines.   *Id.*   The list does not show the reviewer considered any portion of the documents comprising the Plan,[7] including the Plan's medical necessity and residential treatment criteria.   *See id.*

---

[7]  The documents comprising the Plan consist of (1) the Life and Health Benefits Plan of the American Red Cross; (2) the American Red Cross Open Access Plus/PPO Medical Benefits component plan and summary; and the Summary Plan Description.   *See* Admin. R., at 2306–39 (2012 Plan); *Id.* at 316–56 (2012 Open Access); *Id.* at 2376–2425 (2012 Summary).   *See also id.* at 2309 (stating the documents that comprise the Plan).

Rachel questions how carefully the reviewer considered the record because the reviewer's report states Rachel had a longstanding history of purging, and that she was diagnosed with "Anorexia Nervosa, with Binge-Purge features."   Admin. R., at 517; Memo. in Opp'n to Sum. Jdmt., at 9, 11, 27 (ECF No. 34).   Early admission notes state Rachel was purging by use of laxatives, "every other month when starting a new cleanse."   Admin. R., at 441.   Whether this was "longstanding" is unclear due to the ambiguity of that term.   Notably, however, Rachel's counsel argued before Cigna, during an appeal process,[8] that "Rachel had a significant history of purging via abusing laxatives . . . and via excessive exercise."   *Id.* at 834.   While purging via vomiting was new to her after admission, *see id.* at 495, Rachel's history supports purging in an alternative manner prior to admission.   The record, however, does not support that she was diagnosed with Binge-Purge features during the relevant time period.   The reviewer misstated Rachel's diagnosis.

**Plan Terms and Cigna's Guidelines**

Rachel remained in residential treatment until December 31, 2012.   Admin. R., at 516. She seeks coverage from October 5, 2012 to December 31, 2012,[9] *id.*, and contends she met the criteria for medical necessity during that time period.   The Plan defines medical necessity as follows:

---

[8]   The appeal pertained to services in January 2013, which time period is no longer at issue in this case.   Admin. R., at 811; *see infra* note 9.   Nevertheless, the information is relevant.

[9]   Initially, Plaintiff also asserted a claim for coverage from January 1, 2013 to January 17, 2013 for partial hospitalization.   Plaintiff is no longer pursuing that claim, *see* Memo in Opp'n to Sum. Jdmt., at 5 (ECF No. 34), so the denial of coverage for that period is affirmed.

> Medically Necessary Covered Services and Supplies are those
> determined by the Medical Director to be:
>
> - required to diagnose or treat an illness, injury, disease or its
>   symptoms;
>
> - *in accordance with generally accepted standards of medical
>   practice*;
>
> - clinically appropriate in terms of type, frequency, extent, site
>   and duration;
>
> - not primarily for the convenience of the patient, Physician or
>   other health care provider;
>
> - rendered in the *least intensive setting* that is appropriate for the
>   delivery of the services and supplies.

Admin. R., at 354 (emphasis added).   Rachel contends Cigna's denials did not comply with generally accepted standards of medical practice and focused on stepping her down prematurely.

The Plan defines residential treatment as "a subacute, structured, psychotherapeutic treatment program" where the facility "provides 24-hour care, in which a person lives in an open setting."   Admin. R., at 341.   Cigna's Guidelines for "Residential Treatment for Eating Disorders," state that such treatment "is intended for patients who need around-the-clock behavioral care, but who do not need a secure setting with frequent psychiatric and medical nursing interventions."   *Id.* at 415.

Cigna's Guidelines require that services at the residential treatment level be medically necessary.   Cigna's definition of medical necessity is consistent with the Plan's definition. Admin. R., at 415.   Cigna refers to the medical necessity criteria as "basic elements."   *Id.* at 416. Cigna then requires that five additional conditions be met for a person to qualify for admission. The following two are relevant here:

15

> D.  For individuals diagnosed with Anorexia Nervosa, the body weight is less than 90% of Ideal Body Weight (IBW).   However if body weight is greater than 90% of IBW, then one of the following is present:
>
>> 1)  Weight loss of two or more pounds/week . . . .
>
> E. The  individual's  condition  requires  around  the  clock *intervention* to provide interruption of the food restriction, excessive exercise, binging, purging and/or use of laxatives/diet pills/diuretics to avoid harm due to life threatening medical consequences or to avoid life threatening complications due to a co-morbid medical condition (e.g. pregnancy, uncontrolled diabetes) or psychiatric condition.

*Id.* (emphasis added).   To continue care after admission, the Guidelines state, in relevant part, the following:

> Despite active participation by the individual, the treatment plan implemented has not led to enough improvement in the individual's condition such that he/she cannot yet safely move to *and sustain* improvement in a less restrictive level of care as evidenced by:
>
>> ■   the individual continues to suffer from symptoms and/or behaviors that led to this admission
>> . . . .

*Id.* at 417 (emphasis added).   The record is not clear how Cigna applied the last provision.   In other words, it is not clear if the "symptoms and behaviors that led to this admission" were applied in the same manner as they were at admission for purposes of determining if Rachel could safely move to partial hospitalization and sustain improvement.   What is clear is that the December 2012 denial and the IMEDICS denial stated a reason for the denial was that Rachel was above 91 percent of her ideal body weight, i.e. one percentage point above the cut off level set by Cigna's Guidelines.

The Plan requires that any denial "will set forth . . . "[t]he specific reason or reasons for

the denial" and provide "[a] reference to the specific plan provisions on which the denial is based." Admin. R., at 2401.   These requirements also are found in 29 C.F.R. § 2560.503-1(g)(1)(i)–(ii). Thus, Cigna could not rely solely on its guidelines.

## ANALYSIS

### I.   STANDARD OF REVIEW

Rachel seeks "to recover benefits" under the terms of an ERISA plan.   29 U.S.C. § 1132(a)(1)(B).   "Because ERISA is silent with respect to the standard of review," the United States Supreme Court looked to trust law and its "common law principles to decide" what standard was appropriate.   *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 632 (10th Cir. 2003).[10]   The Court concluded a denial of benefits under ERISA should be reviewed *de novo* "'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'"   *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).   The administrator bears the burden of proving a decision should be reviewed under an arbitrary-and-capricious standard."   *LaAsmar*, 605 F.3d at 796.

### A.   Authority Granted to Cigna

Here, the Plan "delegate[d] to Cigna the discretionary authority to interpret and apply Plan terms and to make factual determinations."   Admin. R., at 351.   The Plan also delegated

---

[10]   *Gilbertson* applied a "1977 version of ERISA's claim procedure regulations and the regulations were amended in 2000."   *Brian C. v. ValueOptions*, No. 1:16-cv-93, 2017 U.S. Dist. LEXIS 168409, at *10 (D. Utah Oct. 11, 2017); *see also* Rules & Reg. for Admin. & Enf't; Claims Procedure, 65 Fed. Reg. 70,246, at *70,255–56 (Nov. 21, 2000) (codified at 29 C.F.R. § 2560.503-1(*l*)).   The amendment modified the ERISA regulations on grounds other than the standard of review articulated by the Supreme Court.

discretionary authority to Cigna "to perform a full and fair review . . . of each claim denial which has been appealed by the claimant or his duly authorized representative." *Id.* This is a clear grant of discretionary authority to Cigna. Thus, Cigna is entitled to deferential review of its decision.

## B.     Authority Granted to the Independent Review Organization

The Plan also specifies that a claimant may appeal a denial to an independent review organization ("IRO"), and that the decision by the IRO is final and binding.   Admin. R., at 2402–03.   Rachel exercised this right and the denial of her claim was reviewed by IMEDECS.   The parties dispute whether the Plan granted discretionary authority to the IRO.   Moreover, Plaintiff contends that because the IRO's decision was final and binding on Cigna, it removed Cigna's discretion and made the IRO's decision subject to *de novo* review.

The Plan states the following about the IRO's review authority:

> The IRO will review all of the information and documents timely received and other relevant information that it determines to review. The IRO will make a decision that is independent of any decision that has preceded it . . . .

Admin. R., at 2403.   Unlike the express grant of discretionary authority to Cigna, the Plan chose not to use such language for the IRO's review.   A plan may not want an IRO to have full discretion to interpret and construe plan terms and make such construction binding upon the administrator. If the Plan at issue here did desire such an outcome, it arguably would have used language similar to what it used when describing Cigna's authority.   The Plan's different choice of language is at odds with the conclusion that the IRO was granted the same discretionary authority as Cigna.

Nevertheless, were the court to adopt Plaintiff's argument, it would create havoc with the

deferential review standard because independent, external reviews are required by federal law. *See* 29 C.F.R. § 2590.715-2719(d).   Plans have the option of granting discretionary authority to an administrator, and the United States Supreme Court has determined that when plans elect that option, a deferential standard of review should apply.   Changing that standard to *de novo* review when a claimant elects to pursue an external review has the potential to dismantle the standard set by the Supreme Court.   Although an IRO stands on different footing than an administrator, carrying the level of deference through to all layers of review affords consistency in the law and gives effect to the Supreme Court's *Firestone* ruling.   For these reasons, the court concludes the IRO's decision should be reviewed under the same standard that applies to Cigna.

## II.      EXCEPTION TO DEFERENTIAL STANDARD OF REVIEW

Although a deferential standard of review applies when a plan grants discretionary authority to an administrator, the Tenth Circuit has made clear that for such deferential review to apply "not only must the administrator be given discretion by the plan, but the administrator's decision in a given case must be a valid exercise of that discretion."   *Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009) (quotations and citations omitted).   Courts uphold an administrator's decision if "it was made on a reasoned basis and supported by substantial evidence."   *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018) (citation omitted).

Substantial evidence means "more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion."   *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (quotations and citation omitted).   "A scintilla of evidence . . . is the least quantum of evidence possible in support of a given fact in issue."   *Scintilla*

*of Evidence*, Bouvier Law Dictionary (Desk Edition).   Substantial evidence requires more than

that.   It is not the least quantum of evidence.   It is evidence sufficient for the conclusion to reach

the level of reasonableness, even if the decision is at the low end of the reasonableness continuum.

*See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (citations omitted).   A plan

administrator need not "give the reasoning behind the reasons," but it still must state the particular

reasons for a denial in a non-conclusory manner.   *Flinders v. Workforce Stabilization Plan of

Phillips Petroleum Co.*, 491 F.3d 1180, 1192 (10th Cir. 2007) (quotations and citations omitted).

Moreover, "[s]ubstantiality of the evidence is based upon the record as a whole.   In determining

whether the evidence in support of the administrator's decision is substantial, [the court] must take

into account whatever in the record fairly detracts from its weight."   *Caldwell v. Life Ins. Co. of

N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).

   Following the hearing in this case, the court has reviewed anew the record, counsel's

arguments, and applicable law.   Based on the court's review, it concludes a *de novo* standard of

review should apply because the denial decision was not based on a valid exercise of the discretion

afforded to the administrator and IRO.

## A.     Application of Plan Requirements versus Cigna's Guidelines

   Although the court has concluded the IRO's decision should be reviewed under the same

standard that applies to Cigna, Rachel raises an additional argument as to why the court should

conduct a *de novo* review of Cigna's claim denial.   Rachel contends that Cigna failed to apply the

Plan terms.   In particular, Rachel contends "[n]one of the denial letters applied the definition of

medical necessity."   Pl.'s Opening Brief, at 26 (ECF No. 30).   Instead, "Cigna applied its own

internal guidelines, the Cigna Level of Care Guidelines for Residential Treatment of Eating

Disorders."   *Id.*

As stated above, the Plan contemplates that Cigna may develop "internal rules" for a claim determination.   *See* Admin. R., at 2401.   This is unremarkable because the Plan afforded Cigna discretion to interpret and construe the Plan terms.   Consequently, *de novo* review cannot arise merely because Cigna applied its own internal guidelines.   *De novo* review may arise, however, if Cigna also did not evaluate Rachel's eligibility under the Plan terms to ensure compliance with them.

Recently, the Tenth Circuit addressed whether an administrator had properly applied medical necessity criteria.   The documents at issue were a "summary plan description and a separate medical policy (entitled 'Behavioral Health: Psychiatric Residential Treatment.')."   *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1068 (10th Cir. 2020).   The summary plan contained "general criteria and the medical [policy contained] specific criteria."   *Id.*   Although *both* documents had to be considered when determining medical necessity, Premera's denial letters showed it failed "to apply the medical policy's criteria."   *Id.* at 1068–69.   The Court concluded such conduct was arbitrary and capricious.   *Id.* at 1069.   Accordingly, it remanded the case and instructed "the district court to conduct de novo review of the plan administrator's decision."   *Id.* (citing *Rasenack*, 585 F.3d at 1327 in support that *de novo* review is proper on remand when an administrator's decision was arbitrary and capricious).

In this case, the Plan specifies that residential treatment is for subacute care, and it requires that determinations for such care be based on medically accepted standards in the industry.   The APA Guidelines are recognized in the relevant industry as being the accepted practice for eating disorders.   Yet, none of the denials referred to how Rachel failed to meet these Plan requirements.

They only referred to Cigna's Guidelines, which notably, are *not* part of the Plan.   Moreover, the list of materials that the IRO reviewed does not contain *any* of the three Plan documents at issue in this case.   The IRO only reviewed Cigna's Guidelines.   Although Cigna's Guidelines initially track the criteria of the Plan for medical necessity, Cigna's coverage criteria does not rest on the Plan's criteria.   It adds other criteria that fail to show on their face how they are in keeping with industry standards.   It also defines residential treatment in a different manner than the Plan. Absent consideration of the Plan terms by the administrator, a court is left to speculate about the correctness of the denial.   As *Lyn M*. makes clear, ERISA denials must take into account all relevant plan documents to ensure decisions are based on the terms of the plan and not something else.   Failure to do so is arbitrary and capricious and results in *de novo* review.

### B.  Substantial Evidence

Rachel also contends the denial decisions by Cigna and the IRO were not based on substantial evidence.   Rachel cites extensively to the record in support of her argument.   Cigna contends Rachel has cherry-picked the record and only highlighted the negative treatment notes.   Plan's Resp. to Pl.'s Opening Brief, at 6, 23 (ECF No. 33).   Cigna is correct that Rachel has reported treatment notes that run contrary to facts stated in Cigna's denial letters.   When determining if a denial is supported by substantial evidence, however, a court must "take into account whatever in the record fairly detracts from [a denial decision's] weight."   *Caldwell*, 287 F.3d at 1282.

This does not mean the court substitutes its judgment for that of the administrator. Instead, the court looks to the record as a whole to determine if a denial decision falls within the spectrum of reasonableness.

i.  *Van Steen*

In *Van Steen v. Life Insurance Co. of North America*, 878 F.3d 994, 995–97 (10th Cir. 2018), an employee sought long term disability after suffering a mild traumatic brain injury that resulted in cognitive fatigue and "deficits in executive functioning, attention, memory and higher level attention/speed of processing."   The plan at issue allowed long term disability if an employee was "unable to perform each and every material duty of his or her regular occupation."   *Id.* at 997 (citation omitted).   Stated differently, the Court said a claim could be denied only if an employee could "perform each and every material duty" of the job.   *Id.*

The plan administrator had "full discretionary authority to interpret and construe the terms of the ERISA Plan."[11]   *Id.*   Accordingly, the Tenth Circuit reviewed the administrator's "decision under the arbitrary and capricious standard."   *Id.*   The administrator argued its denial of benefits "was well-supported" by the medical evidence and reviewed by medical experts. *Id.* at 998.   One of the reviewers concluded the employee's "symptoms were not severe enough to preclude occupational function."   *Id.* (quotations and citation omitted).   "[A]n outside neuropsychologist concluded . . . [the] combination of psychological and cognitive symptoms would not be considered to be at a level that would entirely preclude continuous gainful employment."   *Id.* (quotations and citation omitted).   A third reviewer noted certain accommodations the employee would need, "but did not discuss how these accommodations would impact [the employee's] ability to perform his material job duties on a full-time basis."   *Id.* (citation omitted).   At the

---

[11]   A conflict of interest existed because of the administrators "dual role as an insurer and administrator of the Plan."   *Van Steen*, 878 F.3d at 997.   Nevertheless, the court did "not rely on conflict of interest considerations to resolve [the] case."   *Id.*

second appeal level, the administrator provided a "list of tasks that [the employee] was capable of performing, but only in a broad, generalized sense."   *Id.* at 999.

The above statements were comprehensive determinations about the employee's abilities to sustain gainful employment.   Yet, the Tenth Circuit concluded none of the reviewers actually adhered to the Plan language by determining the specific question at issue, namely, whether the employee was "able to perform each and every material duty of his job on a full-time basis."   *Id.* The Court observed that the record contained extensive information about the employee's cognitive fatigue.   *Id.*   It noted that an evaluation was needed to determine whether the employee had "the cognitive stamina to sustain an eight-hour work day for five days a week."   *Id.*   The administrator, however, showed no such evidence.   *Id.*   Consequently, the Tenth Circuit concluded the administrator's decision was arbitrary and capricious because its discretion did "not stretch so far as to ignore the language of the Plan itself."   *Id.* at 1000.

ii.   *American Psychiatric Association Guidelines*

Here, the Plan covers medically necessary services that are rendered in accordance with generally accepted standards of medical practice and in the least restrictive setting appropriate for the necessary services.   Avalon follows the APA Guidelines and Cigna asserts in broad terms that it also has adopted those guidelines.   The APA Guidelines state that even though weight is an important factor for consideration when determining the level of care for an eating disorder, "[w]eight level per se should never be used as the sole criterion for discharge from inpatient care."[12]   Admin. R., at 1966, 1989.   Indeed, as a patient approaches or reaches normal weight

---

[12]   In this context, inpatient care refers not only to inpatient hospitalizations but also to residential treatment.

restoration, that condition actually may cause the patient to need more treatment rather than less. This is so because the patient's weight may cause "a resurgence of anxious and depressive symptoms, irritability, and sometimes suicidal thoughts."  *Id.* at 1968.   In turn, this leads a patient to wanting to restrict and over-exercise to combat the negative surge of emotions.   Releasing a patient "to partial hospitalization programs" at that critical stage often leads to "high rates of early relapse, greater struggles with recovery, and slower rates of progress, necessitating longer future inpatient stays."  *Id.* at 1989.   In other words, a premature release actually can cause harm to a patient.

### iii.  Cigna's December 11, 2012 Denial

Applying *Van Steen* and the industry practices called for by the Plan, the court concludes that Cigna did not answer the relevant question.   Each of the denial letters placed emphasis on Rachel's weight to support why she no longer qualified for residential treatment even though the weight itself led to significant distress for Rachel.   She did not want to be at that weight and was not accepting of it or her meal plan.

Cigna also said Rachel did not qualify for residential treatment because (1) she was more cooperative and motivated; (2) she was gaining insights and attending groups; (3) she was medically stable; (4) her suicidal ideation did not have any accompanying intent or plan; (5) her depression had improved such that she could get out of bed and care for herself; (6) her family was supportive and she was addressing family conflicts in treatment; and (7) she no longer needed 24-hour monitoring.

Reviewing the record as a whole, Cigna's statements about Rachel's weight and some of the above factors are accurate.   She was attending group therapy and did so throughout her

treatment as Avalon.   That factor was unchanged.   She could get out of bed and care for herself and did so throughout her treatment at Avalon.   That factor also was unchanged.

As for the other factors, Rachel was more cooperative, but the record also shows that she remained oppositional to staff and had significant distress over her meal plan at the time of the October 4, 2012 denial.   Although she was gaining insights, the record shows her judgment was still impaired and she had strong urges to restrict her food and over-exercise. Consistent with the cautions stated in the APA Guidelines, Rachel had visible anxiety and distress over her weight gain in October.   She engaged in surreptitious ways to over-exercise and avoid detection.

As for Rachel's suicidality and depression, it also was consistent with what the APA warned about in its guidelines.   Rachel often denied suicidal ideation, including at the time of her admission to Avalon.   Yet, the record also contains many times where Rachel admitted she did have suicidal ideation.   And even though Rachel did not have a specific plan to harm herself, the record reports that Rachel was being closely monitored in October 2012 because she had frequent, intrusive thoughts on how to kill herself.   Moreover, Rachel's distress and suicidal thoughts increased at night after she had to comply with her meal plan all day.   This is significant because partial hospitalization is sometimes referred to as a day hospital program where a person does not stay at a facility overnight.   *See* Admin. R., at 518 (stating the external "review supports care at the Day Hospital level for [Rachel] beginning 10/5/12").

As for Rachel's family, she was addressing conflicts with them and they were supportive and involved.   Nevertheless, those same family therapy sessions often caused Rachel's mood to drop and were a trigger for her.   The reported suicide attempt in November 2012 occurred after Rachel's family therapy session.   Rachel either attempted to commit suicide or she wrapped a

26

seatbelt around her neck and thought about committing suicide.   Her actions were consistent with her January 2012 and July 2012 suicide attempts where she tried to commit suicide by choking herself.   The record also references a similar attempt while en route from Jackson Hole.

Thus, while Cigna reported that Rachel was improving in the areas noted above, the noted areas do not reasonably show why Rachel no longer needed 24-hour care.   For example, stating in the denial that Rachel was "still having body distortions and thoughts of restricting," but that did not warrant residential treatment because she was "continuing to gain insight and weight with an ideal body weight above 91%" does not answer the question.[13]   "Gaining insight" does not mean Rachel had sufficient insight to sustain improvement when her body distortions and thoughts of restricting remained persistent.   Indeed, improved cooperation and insight mean little when such improvements did not change that Rachel remained oppositional and still had strong urges to restrict and planned to restrict if not closely monitored.   Likewise, Rachel's ability to get out of bed and care for herself did not signify that she would not have returned to the same behaviors that resulted in her admission when she was showing visible anxiety and distress over her new weight, and was having frequent, intrusive thoughts on how to kill herself.   Such facts cannot be brushed aside by stating she had no *specific* plan.   Residential treatment is for subacute, not acute care, according to Plan documents.

Reasonableness requires taking into account all facts.   Cigna's December 2012 denial letter runs contrary to the record in a similar manner to *Van Steen*.   Cigna reached the conclusion that Rachel's condition did not qualify for continued residential treatment based on its own

---

[13]   Unless of course Cigna relied heavily upon Rachel's weight in contravention of the APA Guidelines for continued care.

guidelines.   But the question before it was whether Rachel's care was medically necessary based on "accepted standards of medical practice."   That is the Plan language.   Yet, Cigna's denial does not answer why Rachel could safely step down and sustain her progress in the face of her having the very symptoms that the APA Guidelines caution about when a person approaches a target weight.

<em>iv.     The IRO's Denial Letter</em>

The IRO's denial letter likewise fails to meet the reasonableness standard based on substantial evidence.   Similar to Cigna, the IRO noted Rachel's weight, increasing energy, improving mood, and compliance with her medication and nutritional program.   The IRO also noted that on October 5, 2012, Rachel had no suicidal ideation.   The IRO had Rachel's medical records at least through December 31, 2012.   Although services were denied as of October 5, 2012, the IRO was obligated to review the record as a whole and not isolate the evidence to one day.   Moreover, the IRO's conclusory statement that Rachel had no significant or severe symptoms warranting residential treatment suffers from the same deficiencies noted above for Cigna's denial.   Finally, the IRO's denial was based on Cigna's Guidelines and not the Plan terms because the IRO's materials did not contain any Plan documents.

### C.     *De Novo* Review

Although the court has concluded it was arbitrary and capricious to deny Rachel benefits, this "does not automatically entitle Plaintiffs to the remedy they seek."   *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1178 (D. Utah 2019).   "The remedy when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation."   *Caldwell*

*v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288–89 (10th Cir. 2002).   In *Caldwell*, however, the administrator failed to address an issue and had made no findings as to that issue.   Such is not the case here.   Cigna made findings.   But it did so selectively, without fairly taking into account contrary evidence.   Therefore, this case is distinguishable from *Caldwell*.

The Tenth Circuit also addressed whether remand to the administrator was proper in *Rasenack*.   The Court did a comprehensive review of the evidence and concluded the administrator had failed to credit all of the evidence presented.   *Rasenack*, 585 F.3d at 1326 (stating the administrator "cherry-picked the information helpful to its decision to deny" benefits "and disregarded the contrary opinions of the medical professionals").   The Court also concluded the administrator had failed to issue a timely denial, which warranted *de novo* review.   *Id.* at 1327. Under such circumstances, the Court stated the administrator "had its chance to exercise its discretion," but had "failed to do so in accordance with the clear guidelines of the Plan and ERISA."   *Id.*   It therefore remanded the case to the district court to conduct a *de novo* review, and further authorized the court to take additional evidence if needed to address the complex, medical issue.

Here, similar to *Lyn M.*, the IRO did not review any plan documents before affirming the denial.   Additionally, Cigna's reference to the Plan was rote and without substance.   When considered in conjunction with Cigna's selective use of the evidence, the court likewise concludes Cigna had its chance to exercise its discretion.   Thus, remand to the administrator is not warranted and the court will conduct the *de novo* review.

Based on the court's review, it concludes the evidence fails to show Rachel could have safely stepped down and sustained improvement had she been discharged to partial hospitalization

on October 5, 2012.   The evidence shows that for a period of time after October 5, 2012, Rachel continued to meet industry standards for residential treatment.   What is less clear is the date on which Rachel could have stepped down safely.   When a court is evaluating a case *de novo*, it may "conduct[] a bench trial or permit[] additional evidence."   *Lyn M.*, 966 F.3d at 1070 (citation omitted).   The court concludes independent, expert evidence is needed to determine on what day Rachel could have stepped down safely and sustained her improvement based on industry standards.

## III.   OTHER CLAIMS

Rachel's Complaint also asserts claims under 29 U.S.C. §§ 1104, 1109, 1132(a)(2), and 1132(a)(3) for equitable relief and breach of fiduciary duty.   Amended Complaint, at 7–8 (ECF No. 19).   Cigna moves for summary judgment and requests dismissal of all claims under those sections.   Rachel has not opposed such dismissal.   Accordingly, the court grants summary judgment in favor of Cigna and dismisses those claims.

## IV.   MOTION TO STRIKE

Cigna also moves to strike an additional business record that Avalon kept, but did not introduce into the administrative record while the case was on appeal.   Cigna informed Rachel that she, or her representative, would "have the opportunity to explain [her] issue" during the second level appeal meeting on December 10, 2012.   Admin. R., at 524.   Cigna also informed Rachel that the Appeal Committee would "make a decision based on documentation and information presented during the meeting."   *Id.*   Rachel seeks to introduce notes that were recorded during the meeting and kept by Cigna as a business record.   The document contains information that Cigna allowed a total of ten minutes for Rachel's providers and family to speak

during the conference call as to why Cigna's denial was improper.   Insurance Notes, at 6 (ECF No. 30-1).   It contains information about Rachel's stated condition and the specific concerns Avalon had about her condition.   *Id.* at 5–6.   Because such information may be relevant to an expert opining on the date Rachel could have been stepped down to partial hospitalization, the court denies the Motion to Strike.

## CONCLUSION

For the reasons stated above:

1.     The court GRANTS IN PART and DENIES IN PART Cigna's Motion for Summary Judgment (ECF No. 29) as follows:

      A.     The court grants summary judgment in favor of Cigna as to Rachel's claim for coverage of partial hospitalization from January 1, 2013 through January 17, 2013.

      B.     The court grants summary judgment in favor of Cigna as to Rachel's claim for Equitable Relief and Breach of Fiduciary Duty under 29 U.S.C. §§ 1104, 1109, 1132(a)(2), and 1132(a)(3), and hereby dismisses each of those claims with prejudice.

      C.     The court denies summary judgment as to Rachel's claim for coverage under 29 U.S.C. § 1132(a)(1)(B) from October 5, 2012 through December 31, 2012.

2.     The court DENIES Cigna's Motion to Strike (ECF No. 32).

3.     The court sets this matter for a STATUS CONFERENCE on November 5, 2020 at 11:00 a.m.

DATED this 22nd day of October, 2020.

BY THE COURT:

Clark Waddoups
United States District Judge